UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| TIMOTHY HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:17-cv-465-PPS |
| | ) | |
| v. | ) | |
| | ) | |
| STEEL WAREHOUSE, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Timothy Harris claims that his former employer Steel Warehouse

discriminated against him due to his disability and retaliated against him for filing a

worker's compensation claim to boot. Harris worked for Steel Warehouse as an

electrician for about five years before he suffered a workplace injury that left him

without full use of his left hand and arm. For about a year and a half after the injury,

Harris's medical restrictions were in flux. Harris says that to the extent he was not

allowed to return to work, Steel Warehouse's actions amounted to discrimination. He

also says the company illegally retaliated against him under state law for filing a

worker's compensation claim. Steel Warehouse contends nothing of the sort occurred

and has moved for summary judgment on Harris's claims.

There's also a procedural wrinkle here. Harris has filed a Motion to Certify a

question to the Indiana Supreme Court. He says that his state law claim presents a

novel and important question of Indiana state law and that before I rule on it, I should

ask that Indiana's highest court step in and guide my answer. But because I don't think the question raised by Harris satisfies the stringent requirements of certifying a question to the Indiana Supreme Court, I will deny that motion. As for the underlying claims, the undisputed facts here show that Steel Warehouse did not discharge Harris in retaliation for him filing a worker's compensation claim. Likewise, the company satisfied its legal obligations under the Americans with Disabilities Act (ADA) and consequently, the undisputed facts show it is entitled to summary judgment on that claim too. Thus, I will grant Steel Warehouse's motion and this case will be resolved without a trial.

## Background

Steel Warehouse is in the business of steel processing. Harris began work at Steel Warehouse as an electrician in August 2011. As an electrician, Harris was part of a maintenance team which worked to service and repair the heavy machinery used in Steel Warehouse's facilities. There is apparently no written job description of an electrician at Steel Warehouse, but the parties agree that when he began, Harris was able to perform the functions of the job just fine. Harris worked at Steel Warehouse for more than four years without much issue, and there is no indication that Steel Warehouse was planning to terminate Harris's employment for performance reasons.

In November 2015, Harris had shoulder surgery and went on temporary medical leave from November 19, 2015 to January 4, 2016. After that period of recovery, Harris returned to work as an electrician. The parties dispute the nature of the work Harris performed from January to April 2016. Harris says that in the months following his

shoulder surgery, he wasn't at 100% and couldn't do his job quite the same. Specifically, he had medical restrictions of no lifting, pushing or pulling and no overhead work. [DE 41-6.] He says that as a result of these restrictions, Steel Warehouse gave him a medical accommodation for several months, that he was only given "light work" and that, without giving specifics, when there were jobs or tasks he couldn't do, another electrician on shift did them. [DE 40 at 16.]

Steel Warehouse says Harris mischaracterizes how the company handled Harris's medical restrictions. It says that the medical restrictions Harris had after his surgery were mostly inconsequential and didn't impact his ability to perform the essential functions of his job. Thus, no accommodation of "light work only" was required. And the employee responsible for assigning Mr. Harris work denied giving him light duty work, and that Harris did his normal job, just without any heavy lifting. [DE 41-2, Jeffrey Dep. at 20.]

On April 19, 2016, Harris was severely injured on the job. His left arm was crushed, but the exact cause of this injury is unclear: Steel Warehouse says it was because of the "deliberate unsafe acts" of Harris and a coworker for which Harris was eventually written up for, but Harris says it was an accident and he was only written up after he filed a complaint with the Equal Employment Opportunity Commission (EEOC). But the basic takeaway is that Harris was using a steel cutting machine and got his arm caught in it. Harris was rushed to the hospital and underwent multiple surgeries on his arm. He underwent additional surgery on the arm in June 2016. These

injuries unquestionably kept Harris from being able to work for several months and even resulted in some permanent injuries.

On July 20, 2016, after several months of recovery, Harris's doctor gave him written medical restrictions. He was restricted to no lifting or weight-bearing on his left arm and limited to an 8-hour workday.  [DE 41-1, Harris Dep. at 133.] He was cleared to return to work, with restrictions, on August 8, 2016 and sought reinstatement from Steel Warehouse. But the company did not allow Harris to return to work because, according to its side of the story, Harris could not adequately work as an electrician due to his medical restrictions. Steel Warehouse's decision was based on Harris's inability to fully use his left hand, which it contends is necessary in order to perform the essential functions of an electrician. It says that this impairment was thus altogether different from Harris's limitations when he was recovering from shoulder surgery in early 2016. Harris quibbles with this characterization, noting that his doctor did not restrict him from using his left hand entirely, but he doesn't deny some limitations. Harris testified that he could grasp with his left hand, but that because he could not feel all his fingers fully, he had issues with his fine motor skills. [*Id.* at 158-159.]

Harris's employer-provided health insurance terminated on July 21, 2016, in accordance with his union contract which allowed for three months of insurance while an employee was on leave. [*See* DE 37-6 at 73.] On August 3, Harris and his attorneys informed Steel Warehouse that he was intending to file a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) because the company would not let him return to work. [DE 41-29.] A week later, on August 10, Steel Warehouse

issued a "Violation of Company Rules" to Harris for deliberate unsafe acts in using the shear which led to his workplace injury the previous April. [DE 41-31.] And while in his briefing, Harris mentions these events together, noting their temporal connection, he does not argue or directly imply there was any connection between them, *i.e.* that he was written up for the injury as a result of notifying Steel Warehouse he was going to file a complaint with the EEOC.

Over the next several months, Harris continued to recover from his injuries and continued seeing his medical team for rehabilitation. Throughout the process, he received revised medical restrictions from his doctors. Specifically, they were revised on September 28, November 8, December 5, and April 24, 2017. While the exact restrictions Harris had varied, at each step, Harris's doctors restricted his use of his left hand in some capacity each time. And at each juncture when Harris requested to return to work, Steel Warehouse denied it for the same reason: it said he couldn't do the job without full use of both hands and there was no light duty position available that he could temporarily work in.

On June 12, 2017, Harris received revised medical restrictions and was given only a five-pound lifting restriction. Importantly, Harris had no grasping restriction whatsoever on his left hand. Steel Warehouse reinstated Harris and he began to work again for the company as an electrician, and he continued to do so for several months.

Harris's employment with Steel Warehouse hit another speed bump on September 11, 2017, when his medical restrictions were revised again. This time he was restricted to no vertical ladders, no climbing in and out of buckets and to an 8-hour

work day. Even though there was no grasping restriction, this caused Steel Warehouse to reevaluate Harris's ability to work. It told Harris that because he could no longer climb out of an elevated lift bucket, he could no longer work overtime on the weekends when he would be the only electrician on duty. Climbing out of an elevated bucket was required to repair cranes, a frequent part of his job. Harris was the only electrician on duty and when the need came up, the company would have to bring in a second electrician to do that part of the job. But the company nonetheless allowed him to continue to work during the week (when other electricians were on duty). In January of 2018, after this lawsuit was filed, Harris resigned from Steel Warehouse and took a job elsewhere.

## Discussion

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and [the moving party is] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing no genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). When making that call, I must draw all reasonable inferences in favor of the nonmoving party. *Ozlowski v. Henderson*, 237 F.3d 837, 839 (7th Cir. 2001). Harris is the nonmoving party. So to avoid summary judgment, he must marshal enough evidence—that is, more than a scintilla— to convince me that there are disputed issues of material fact that require a jury to resolve. *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013) ("To survive a motion for summary judgment, she must present the court with evidence that, if believed by a trier of fact, would establish each of the elements of her claim."). A

genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), or by "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact only exists if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252. As the Seventh Circuit is fond of saying, "it is the put up or shut up moment in a lawsuit." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (citation omitted).

## A. Harris's ADA Claim

To prevail on his ADA claim, Harris needs to show that (1) he is disabled; (2) he was otherwise qualified to perform the essential functions of his job with or without reasonable accommodation; and (3) his employer took an adverse job action against him because of his disability or without making a reasonable accommodation for it. *Winsley v. Cook County*, 563 F.3d 598, 603 (7th Cir. 2009). If Steel Warehouse can show that there is no evidence which would allow a jury to find in Harris's favor on any of those elements, I must grant summary judgment in its favor. Steel Warehouse's argument focuses on the second and third elements of the claim, and so I will assume Harris was disabled during the periods in question.

Given the length of time involved and varying state of Mr. Harris's impairments and limitations throughout the period in question, some categorization is in order. The parties agree Harris could not work at all from April 19, 2016 to August 8, 2016 or from March 2, to April 24, 2017. [DE 40 at 7, n.6.] Thus, those portions of the saga can

generally be set aside and the question becomes whether Steel Warehouse discriminated against Harris by refusing him a light duty position from August 8, 2016 to March 1, 2017 and from April 24, 2017 to June 11, 2017. There is also the separate issue as to whether Steel Warehouse's prohibiting Harris from working weekend overtime after September 14, 2017 violated the ADA. Accordingly, I will analyze these three separate periods of time individually.

Harris concedes, as he must, that throughout this time, he wasn't operating at 100% and had several restrictions from his doctors as to what he could and could not do. That is why he is claiming a disability. The most relevant of these restrictions was those limitations on Harris's use of his left hand which persisted, to varying degrees, for more than a year after his injury. Steel Warehouse says these hand-use limitations are dispositive because they kept Harris from performing the essential functions of his job.

Essential functions are exactly what they sound like—the fundamental tasks and responsibilities of any given job. While numerous factors are considered in determining what are the actual essential functions of a job, an employer is generally allowed to define them, so long as they are defined in a reasonable and non-pretextual fashion. *Basith v. Cook County,* 241 F.3d 919, 929 (7th Cir. 2001) ("Cook County is allowed to determine the job responsibilities of its pharmacy technicians, and it is not this court's duty to second-guess that judgment so long as the employer's reasons are not pretextual."); *DePaoli v. Abbott Labs.,* 140 F.3d 668, 674 (7th Cir. 1998) ("Although we look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions, we do not otherwise second-guess the

employer's judgment in describing the essential requirements for the job.") (citations omitted).

Steel Warehouse has identified 15 tasks which it says are essential functions of the electrician job and which require full use of both hands. Those are:

> (1) Accessing the electrical boxes to fix many machines; (2) fixing the components inside those boxes; (3) pulling wires; (4) stripping wires; (5) wring out wires; (6) using a meter to conduct electrical tests; (7) climbing ladders to access and repair overhead cranes used to move material through the facilities and to access the various levels of the Tucker Street facilities; (8) climbing out of lift buckets and over catwalk railing to access and fix most of the overhead cranes; (9) running conduit; (10) fixing limit switches; (11) manipulating small wires; (12) replacing contactors; (13) pulling out hardware with two-latch releases in electrical boxes; (14) fixing the buttons on many of the pendants used to control machines; and (15) performing some "bench or shop work," including rebuilding electrical panels and remotes used to control machines and troubleshoot a device.

[DE 38 at 3; DE 41-1, Harris Dep. at 80-91, 95-105, 145-46, 242-46.] Importantly, Harris agreed at his deposition that these tasks required use of both hands, at least in part. He described many other tasks or functions of the job which he could do with one hand but agreed that at least these fifteen required the use of both hands and that they were regular parts of his job. [*Id.*] He also admitted they were part of his general job duties.

For the most part, Harris does not challenge the fact that these functions are "essential" to the job of an electrician. As such, Harris could not fully perform all of the essential functions of his job as an electrician while he had limitations on the use of one hand. But the ADA's requirements don't stop there. The question becomes, what sort of accommodation was Steel Warehouse required to offer Harris on account of his disability? The law is clear that an employer is only required to give a "reasonable"

accommodation, and so I must determine whether a reasonable accommodation existed under these circumstances.

Harris says that letting him work on "light duty" as he says he did from January to April 2016 would have been a reasonable accommodation. He says that while he was recovering, he could have focused on desk work and avoided the types of physical tasks he was unable to perform. Steel Warehouse says that this would have been an unreasonable burden on it because there was no light duty position in existence. It says Harris wanted it to create a new job for him and the ADA does not impose such a burden on employers. I agree with Steel Warehouse.

Harris is correct when he says that the ADA may require an employer to place an injured worker in a temporary light duty position if there is such an open position available or the employer sets aside temporary positions for injured workers. *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 696 (7th Cir. 1998). But the ADA does not require an employer "to create new full-time positions to accommodate its disabled employees." *Id.* at 697 (quoting *Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667, 680 (7th Cir. 1998)). Nor does it require employers to grant every disability-related request or accommodate an individual employee in the method that employee prefers. *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 546 (7th Cir.2008) ("An employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation.").

The main problem for Harris is that he cannot point to any *open* light duty jobs which were vacant at Steel Warehouse. If he could, there might be a different result. *See,*

*e.g.*, *Gibson v. Milwaukee Cty.*, 95 F. Supp. 3d 1061, 1073 (E.D. Wis. 2015) (finding employer violated ADA when it refused to allow non-injured plaintiff to apply for light-duty positions it had reserved for employees recovering from workplace injuries). Nor was there a temporary light duty program for injured works at Steel Warehouse, as some industrial employers have. *See, e.g.*, *Hendricks-Robinson*, 154 F.3d at 697-698.

Harris responds that this is unfair because in the past Steel Warehouse has given other disabled or injured employees, including him, temporary light duty assignments. But even assuming that is true, that doesn't change the fact that Harris is seeking to expand the ADA beyond what the law covers. The Seventh Circuit has long rejected the idea that because an employer gave one employee an accommodation in the past, they are obligated as a matter of law to give the same accommodation to another employee. *Basith*, 241 F.3d at 930 ("[W]e do not believe it wise to . . . punish Cook County for going beyond the ADA's requirements."); *Sieberns v. Wal–Mart Stores, Inc.*, 125 F.3d 1019, 1023 (7th Cir. 1997) ("Employers should not be discouraged from doing more than the ADA requires...."). "An employer may provide an employee with an accommodation not required by the ADA without thereby becoming obligated to provide all similarly situated employees with the same accommodation." *Severson v. Heartland Woodcraft, Inc.*, 2015 WL 7113390, at *8 (E.D. Wis. Nov. 12, 2015), *aff'd*, 872 F.3d 476 (7th Cir. 2017).

This is sensible. To hold otherwise would be to create perverse incentives where an employer would shy away from accommodating employees beyond the mandatory floor created by the ADA, lest they be punished in the future for their gratuitous accommodations. *See Vande Zande v. State of Wis. Dep't. of Admin.*, 44 F.3d 538, 545 (7th

Cir. 1995) ("[I]f the employer ... goes further than the law requires ... it must not be punished for its generosity"). In other words, good deeds can in fact go unpunished, at least in the ADA context. Thus, Harris's contention that he "was able to perform the essential functions of a temporary, light duty assignment" from August 8, 2016 to March 2, 2017 [DE 40 at 13], is not relevant. No such position existed, and Steel Warehouse was not required to create one for Harris. The fact that Harris worked after his shoulder injury in early 2016 is furthermore an inapt comparison; his limitations and medical restrictions were different and did not include any limitation on grasping with his hands after his shoulder surgery. In sum, there is no evidence that Steel Warehouse discriminated against Harris during the period of August 8, 2016 to March 2, 2017.

This brings us to the period between April 24, 2017 and June 11, 2017, the date Harris was reinstated by Steel Warehouse. (Recall that Harris concedes he could not work at all between March 2, 2017 and April 24, 2017.) In his brief, Harris says that his only medical restrictions were "no repetitive left wrist movement" and "no ladders." [DE 40 at 23.] Thus, he says, he could grasp with both hands and do his job as of April 2017. The big problem with Harris's argument is that the evidence he cites flatly contradicts him. His medical form says "No repetitive left wrist movement *or grasping* and no ladders." [DE 41-16.] So when Harris (or his attorneys, who I might remind owe a duty of candor to the court) say, "Mr. Harris' April 24, 2017 restrictions allowed for him to grasp with both hands" they are contradicting their own submitted evidence. Because Harris had a similar "no grasping" restriction from April 24 to June 11 that he had between August 8, 2016 and March 2, 2017, the result is the same. Without the

ability to grasp with both hands, Harris could not perform the essential functions of his job and was thus not qualified.

We come now to the final period in question: post-September 11, 2017. This is the date on which Harris's doctors imposed a medical restriction of no climbing in or out of elevated buckets. When this restriction was imposed, Steel Warehouse stopped letting Harris work weekend overtime, after having been working since June 11, 2017. Steel Warehouse says that this limitation meant Harris could not perform all the essential functions of the job. It says that relieving him from that function wasn't an option either because it says he would have been the only electrician on duty during the weekend. During the week, there were multiple electricians on duty, and Harris was permitted to continue working his regular hours during the work.

While Harris agrees that climbing in and out of elevated buckets is necessary in order to fix the cranes, he contests that fixing the cranes on the weekend was an essential function. He argues that, in his opinion, it was reasonable for Steel Warehouse to wait until Monday to have another electrician fix them. To do so, he relies on the testimony of Robert Johnson, an employee of Steel Warehouse who testified that he did not "believe that [climbing in and out of an elevated bucket is] an essential function for [Harris's] job." [DE 41-3, Johnson Dep. at 58-59.] The other relevant testimony he cites to is his own, that fixing a crane over a weekend verses waiting until Monday was "a supervisor's call" and that often "they would wait until Monday to work on it." [DE 41-1, Harris Dep. at 202.]

On the other end of the scale is Steel Warehouse's evidence. First, it challenges Harris's characterization of Johnson's testimony. For one, Johnson testified that he was not familiar with the ADA's definition of "essential function" (an unsurprising fact for a nonlawyer). [DE 41-3, Johnson Dep. at 59.] But he did testify that maintaining working cranes and fixing them in a timely manner was an important part of the job because "[t]he overhead crane continues our operation. Without an overhead crane, potentially, operations will stop . . . not producing product for our customers." [*Id.* at 71-72.] It says that this is evidence to support the legal conclusion that fixing cranes was an essential function, regardless of whether Johnson knew the proper legal terminology. Steel Warehouse also points out that Harris conceded that cranes are important for Steel Warehouse's business: they move the product from place to place throughout the facility and if certain cranes are broken, it could halt all production in the facility. [DE 41-1, Harris Dep. at 84.] And Harris further testified that there were more than 30 cranes at the facility and that repairing cranes constituted about 20 percent of his job. [*Id.* at 84, 202-203.]

The determination of whether something is an essential function of a job is guided by the factors listed in. 29 C.F.R. § 1630.2(n)(3); *Lenker v. Methodist Hosp.*, 210 F.3d 792, 796 (7th Cir. 2000). Those factors are: "(i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applications for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work

experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs." *Id.* It is true that an employer's judgment is a very important factor, but they don't get the final say-so, and I cannot simply rubberstamp their judgment. *Basith,* 241 F.3d at 928-29; *DePaoli*, 140 F.3d at 674.

The only real evidence Harris offers are his own opinion that fixing cranes is not an essential function because supervisors sometimes put off fixing cranes until Monday and not all crane breakdowns would shut down entire production lines. Notably, the employee's opinion is not one of the enumerated factors listed in the applicable federal regulations as to what the essential function is. But the employer's judgment (maintaining cranes is important), amount of time spent on the function (roughly 20% of an electrician's time), and consequences of not performing the function (potential plant shut down) are. All of those go in Steel Warehouse's favor, with Johnson's testimony being a little internally inconsistent, but not enough to create an issue for the jury. Harris offers nothing more than the proverbial scintilla of evidence which is not enough to overcome summary judgment.

Because Harris fails to offer sufficient evidence to create a disputed issue of fact as to whether fixing cranes in a timely manner is an essential function of the electrician job, his claim concerning overtime fails. His proposed accommodation of bringing in another electrician if a crane broke or postponing maintenance until Monday are simply unreasonable. The ADA does not require an employer to have two employees do the job of one when a disabled employee cannot perform the essential functions of the job on their own—that's not a reasonable accommodation. *Majors v. Gen. Elec. Co.*, 714 F.3d

527, 534 (7th Cir. 2013) ("To have another employee perform a position's essential function, and to a certain extent perform the job for the employee, is not a reasonable accommodation."); *see also Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 912 (7th Cir. 1996) (employee's suggested accommodation of hiring a helper to perform an essential function of the job, the overhead work required by the position, was not a reasonable accommodation).

In sum, the law does not mandate that Steel Warehouse have a second employee at the ready to assist Harris with an essential function of his job. This principle is fatal to Harris's claim that the company should have allowed him to keep working weekend overtime after September 2017 when he was medically restricted from climbing in and out of buckets. Doubling the number of overtime electricians on weekends so that Harris could keep getting overtime would not have been reasonable. Likewise, given the uncontroverted evidence of potential threats to production posed by a broken crane, delaying maintenance on cranes as a matter of course in order to accommodate Harris's desire to work overtime wasn't reasonable.

### B. Indiana State Law Unlawful Termination or *Frampton* Claim

Harris has also asserted a claim under Indiana state law. He says that while he was on indefinite leave from Steel Warehouse, his employment was effectively terminated. He says his worker's compensation claim motivated the retaliation. But as we know, Steel Warehouse never technically terminated Harris. He was placed on involuntary leave for over a year before eventually returning to work. Then he resigned

a few months after he was prohibited from working overtime hours. Steel Warehouse says these facts are not enough for Harris to take this claim to a jury. I agree.

Indiana, like most states, has embraced the concept of "employment at-will." That is, an employer may fire an employee for any reason or no reason at all, so long as the reason is not prohibited by law. Decades ago, the Indiana Supreme Court created an exception to the employment at-will doctrine in the seminal case of *Frampton v. Cent. Ind. Gas. Co.* In that case, the court held that an employee who "alleges he or she was retaliatorily discharged for filing a claim pursuant to the Indiana Workmen's Compensation Act or the Indiana Workmen's Occupational Diseases Act, has stated a claim upon which relief can be granted." *Frampton v. Cent. Ind. Gas. Co.*, 297 N.E.2d 425, 428 (Ind. 1973) (citations omitted). In effect, an employer cannot legally fire an employee because the employee files a claim for worker's compensation because to allow that would upset the Indiana legislature's efforts to create an effective worker's compensation regime. *Id.* at 428. ("Retaliatory discharge for filing a workmen's compensation claim is a wrongful, unconscionable act and should be actionable in a court of law.").

After the April 2016 accident, Harris promptly filed a workmen's compensation claim. That's not in issue. The focus for our purposes is whether Harris can plausibly say he was "retaliatorily discharged" in response to him filing the claim. Steel Warehouse says he cannot and, as a result, summary judgment should be granted in its favor. Harris agrees he was not discharged *per se* but says that before I base a ruling

only on that fact, I should check in with the Indiana Supreme Court first to make sure it doesn't want to expand *Frampton* claims to cover situations like his.

Pursuant to Indiana Rule of Appellate Procedure 64, federal courts "may certify a question of Indiana law to the Supreme Court when it appears to the federal court that a proceeding presents an issue of state law that is determinative of the case and on which there is no clear controlling Indiana precedent." Ind. R. App. P. 64(a). "A case is appropriate for certification where it 'concerns a matter of vital public concern, where the issue is likely to recur in other cases, where resolution of the question to be certified is outcome determinative of the case, and where the state supreme court has yet to have an opportunity to illuminate a clear path on the issue.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1101 (7th Cir. 2008) (citation omitted). "Questions that are tied to the specific facts of a case are typically not ideal candidates for certification." *Id.* Harris has asked me to certify a question to the Indiana Supreme Court: "Can an employer-defendant's removal of its employee-plaintiff from service be actionable under the wrongful and retaliatory discharge cause of action pursuant to *Frampton* when said removal is unpaid and indefinite?" [DE 30 at 3.]

Since *Frampton* was decided in 1973, it has remained a narrow exception to the employment at-will default. The Indiana Supreme Court has reiterated *Frampton* is "quite a limited exception" and that "[m]ost cases have refused to extend *Frampton*" because employment-at-will is the public policy of Indiana and it is for the legislature, not the courts, to revise it. *Meyers v. Meyers*, 861 N.E.2d 704, 707 (Ind. 2007); *see also Montgomery v. Bd. of Trustees of Purdue Univ.*, 849 N.E.2d 1120, 1127 (Ind. 2006) (refusing

to extend *Frampton* to cover retaliation for violations of the Indiana Age Discrimination Act). In fact, the real only "expansion" of *Frampton* was in *Baker v. Tremco, Inc.*, where the Indiana Supreme Court recognized that constructive discharge (where an employee is forced to resign because of hellish working conditions) is legally indistinguishable from traditional termination. *Baker v. Tremco Inc.*, 917 N.E.2d 650, 655 (Ind. 2009); *see also Tony v. Elkhart Cty.*, 918 N.E.2d 363, 368 (Ind. Ct. App. 2009) (discussing history of *Frampton* and *Baker*). But that's about it, and I don't think this case warrants asking the Indiana Supreme Court to once again say that *Frampton* is a limited exception and narrow holding. Nothing in the jurisprudence suggests a discharge (actual or constructive) is not an essential element. Harris wasn't discharged; he returned to work and then quit of his own volition.

     *Harney* is instructive. In that case, the Seventh Circuit denied a request for certification in a case concerning a dispute between employer and employee. As the court noted, the Indiana Supreme Court had provided guidance in several cases as to when bonuses should be considered "wages" under Indiana law. *Harney*, 526 F.3d at 1101. And certifying the question in that case, whether bonuses were wages in the context of that specific employer-employee relationship, was likely to only benefit the litigants and parties before the court. *Id.*

     So too here. The factual specifics of Harris's claim help to outweigh any precedential decision that might come about in his favor. For months after the initial refusal to reinstate him, Harris saw doctors and worked to have his medical restrictions limited so that he could return to work. That process took nearly a year and was specific

to Harris's injuries and the requirements of his job as an electrician. Given the amount of factual particularities in this case, I don't think having the Indiana Supreme Court weigh in would be particularly helpful to future litigations either.

The Indiana Supreme Court's consistently narrow reading of *Frampton* since it was decided gives me no confidence that it would now create a new cause of action for employees on indefinite unpaid leave recuperating from workplace injuries but who eventually return to work. Nothing Harris offers leads me to think that the Indiana Supreme Court would break new ground by crafting an additional exception to Indiana's limited *Frampton* doctrine.

Finally, it is worth noting that Harris directs me to an earlier decision of mine in which a similar issue came up. In *Menefee v. UPS*, I dismissed a *Frampton* claim in a case where "an employer refuse[d] to allow an employee to return to work but [did] not officially fire the person." *Menefee v. United Postal Serv., Inc.*, 2008 WL 4682606, at *3 (Oct. 21, 2008). In passing, I said that "[t]heoretically, there might be a situation in which the Indiana courts would find that telling an employee that she cannot return from medical leave amounts to an actual discharge" but that "[i]t does not seem likely that the Supreme Court would extend *Frampton* to cover the type of situation at play here." *Id*. I think that remains the case today.

In sum, without evidence that he was terminated or constructive discharged, Harris's *Frampton* claim fails as a matter of law. Steel Warehouse is entitled to summary judgment on this claim too.

**Conclusion**

For the foregoing reasons, Plaintiff Timothy Harris's Motion to Certify to the Indiana Supreme Court [DE 29] is DENIED; and Defendant Steel Warehouse's Motion for Summary Judgment [DE 36] is GRANTED. The Clerk is DIRECTED to close this case.

SO ORDERED on August 19, 2019.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT